ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
     – and –
PAUL J. GELLER (*pro hac vice* forthcoming)
STUART A. DAVIDSON (*pro hac vice* forthcoming)
CHRISTOPHER C. GOLD (*pro hac vice* forthcoming)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com

WITES LAW FIRM
MARC A. WITES (*pro hac vice* forthcoming)
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: 954/933-4400
mwites@witeslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARISSA PASCARELLA and SCHWARTZ EYE ASSOCIATES, P.A., Individually and on Behalf of All Others Similarly Situated, <br><br>                    Plaintiffs, <br><br>   vs. <br><br>INTEL CORPORATION, <br><br>                    Defendant. | Case No. <br><br>CLASS ACTION <br><br>COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *ET SEQ.*, CAL. BUS. & PROF. CODE §17200, *ET SEQ.*, THE MAGNUSON-MOSS WARRANTY ACT AND FL. STAT. §501.201, *ET SEQ.*, AND BREACH OF WARRANTY, BREACH OF IMPLIED WARRANTY AND UNJUST ENRICHMENT <br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Marissa Pascarella and Schwartz Eye Associates, P.A. ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Intel Corporation ("Intel" or "Defendant") and make the following allegations, which are based upon the investigation of counsel, Plaintiffs' personal knowledge, and information and belief:

<b>SUMMARY OF THE ACTION</b>

1.      Intel is an American technology company headquartered in Santa Clara, California. Until 2017, Intel was the world's largest manufacturer of semiconductor chips ("CPU(s)") – the hardware component responsible for interpreting and executing most of the commands from a computer's other hardware and software, *i.e.*, the brain of a computer, laptop, or mobile device. Intel sells its CPUs individually and as components of personal computers and mobile devices manufactured by other companies, such as Apple, Asus, Acer, Google, Lenovo, Hewlett Packard, and Dell. It has been reported that 90% of the approximately 1.5 billion personal computers in use today are powered by Intel CPUs.

2.      Speed and security are two of the most essential features in a CPU, and Intel's success is largely based on the advertised speed and security of its CPUs. But Intel's focus on producing a faster CPU left its CPUs with security vulnerabilities and exposed to cyber-attack. Specifically, in 1995 Intel began designing most of its modern CPUs to perform a process known as "speculative execution," which is intended to increase performance by allowing a CPU to predict its next set of instructions ("Defect"). While speculative execution may increase the speed of a CPU, Intel has known for many months, and recently reported on January 3, 2018, that speculative execution creates serious security vulnerabilities – dubbed Meltdown and Spectre – that can be exploited by hackers to steal passwords, encryption keys, photos, emails, instant messages, sensitive business documents, and other sensitive data.

3.      The Defect exists in nearly every Intel CPU manufactured in the last 20 years and, thus, affects most personal computers, laptops, smartphones, tablets, and servers in use today ("Affected Devices").

4.      Intel has admitted to having knowledge of the Defect for at least six months, yet during that time, Intel continued to manufacture, sell, and distribute its defective CPUs without

disclosure of the Defect.  Intel knew or should have known of the Defect long ago but either failed to disclose the Defect or was negligent or reckless in failing to discover it.  Indeed, working without the benefit of Intel's proprietary information, at least three security researchers independently discovered the Defect in 2017.  With its inside knowledge and familiarity with the design and inner workings of its CPUs, Intel was in a better position to discover the Defect than third-party researchers and, as the manufacturer of the defective CPUs that it introduced into the market, Intel had a duty to do so.

5.     Since the Defect was finally confirmed by Intel on January 3, 2018, companies like Google, Apple, Microsoft, and others have scrambled to release software patches to address the security vulnerabilities in Intel CPUs.  But since the Defect is a design defect existing in the hardware and architecture of each affected CPU, a software patch will do nothing more than "mitigate" the threat.  And, moreover, it has been widely reported that any mitigation patch could *reduce the performance of an Affected Device by up to 30% or more*.

6.     Only a full redesign of Intel's CPUs can remedy the Defect and eliminate the Meltdown and Spectre security vulnerabilities.  Indeed, Intel issued separate statements confirming that each defective CPU "is operating exactly as it is designed"[1] and that "Intel is continuing to investigate *architecture and/or microarchitecture changes* to combat these types of attacks."[2]

7.     Thus, because security is a critical feature of any part of an Affected Device's hardware or software, the CPUs Intel designed, manufactured, distributed, sold, and installed in Affected Devices sold to Plaintiffs and the Class (defined below) were not merchantable and were not fit for the ordinary and particular purposes for which such goods are used.

8.     Plaintiffs and the other members of the Class are now forced to either purchase a new, Defect-free CPU or continue to use a defective CPU with serious security vulnerabilities and/or significantly reduced performance.

---

[1]     Intel, https://www.intel.com/content/www/us/en/architecture-and-technology/facts-about-side-channel-analysis-and-intel-products.html (last visited Jan. 16, 2018).

[2]     *Intel Analysis of Speculative Execution Side Channels*, at 8, https://newsroom.intel.com/wp-content/uploads/sites/11/2018/01/Intel-Analysis-of-Speculative-Execution-Side-Channels.pdf (Jan. 2018) ("*Intel Analysis*").

9. Plaintiffs and the other members of the Class have suffered ascertainable injuries and loss of money or property as a result of Defendant's wrongdoing because they would not have purchased Intel's CPUs, or Affected Devices containing Intel CPUs, or would not have paid the price they paid, but for Intel's failure to disclose the existence of the Defect.

## PARTIES

10. Plaintiff Marissa Pascarella ("Pascarella") is a resident of Palm Beach County, Florida and a citizen of Florida. In November 2017, Pascarella purchased a Dell Inspiron 15.6" Touch-Screen Laptop, Model I3567-3657BLK-PUS, which was equipped with an Intel Core i3 CPU that is affected by the Defect. Pascarella would not have purchased this Affected Device containing a defective Intel CPU, or would not have paid the price she paid, but for Intel's failure to disclose the existence of the Defect.

11. Plaintiff Schwartz Eye Associates, P.A. ("Schwartz Eye Associates") is a business located in Fort Lauderdale, Florida that provides optometry services. Schwartz Eye Associates is a citizen of Florida. In 2015, Schwartz Eye Associates purchased an HP Pavilion 21 TouchSmart All-in-One PC, model 21-h013w, which was equipped with an Intel Pentium G3220T CPU that is affected by the Defect. Schwartz Eye Associates would not have purchased this Affected Device containing a defective Intel CPU, or would not have paid the price it paid, but for Intel's failure to disclose the existence of the Defect.

12. Defendant Intel Corporation is an American semiconductor company with headquarters at 2200 Mission College Boulevard, Santa Clara, California. At all relevant times, Intel was engaged in designing, manufacturing, distributing, and selling electronic computer components, including the defectively designed CPUs at issue.

## INTRADISTRICT ASSIGNMENT

13. This action is properly assigned to the San Jose Division because Defendant is headquartered in Santa Clara County, and a substantial part of the events or omissions that give rise to the claims asserted herein occurred in Santa Clara County.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction under 28 U.S.C. §1332(d)(2)(A) as modified by the Class Action Fairness Act of 2005 because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5 million exclusive of interest and costs.

15.     Venue is proper under 28 U.S.C. §1391 because many of the acts and transactions underlying this action occurred in this District and because: (a) a substantial part of the events or omissions giving rise to this claim occurred in this District; (b) Defendant is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution, and sale of its defective CPUs; (c) Defendant conducts substantial business in this District; and (d) Defendant is subject to personal jurisdiction in this District.

**SUBSTANTIVE ALLEGATIONS**

16.     Intel is an American technology company headquartered in Santa Clara, California. Until 2017, Intel was the world's largest manufacturer of CPUs – the hardware component that serves as the brain of a computer, laptop, or mobile device.  Intel sells its CPUs individually and as components of Affected Devices manufactured by other companies such as Apple, Asus, Acer, Google, Lenovo, Hewlett Packard, and Dell.  It has been reported that 90% of the approximately 1.5 billion personal computers in use today are powered by Intel CPUs.

17.     In a January 3, 2018 statement, Google revealed that, sometime in 2017, security researchers from Google's Project Zero discovered "serious security flaws" existing in most of Intel's CPUs.  The security flaws – dubbed Meltdown and Spectre – were reportedly discovered simultaneously by multiple research groups working independently from one another, including, but not limited to, researchers from Cyberus Technology and the Graz University of Technology.

18.     The Meltdown and Spectre vulnerabilities are the result of an undisclosed tradeoff that Intel made between security and performance in order to manufacture faster CPUs and become the dominant CPU manufacturer in the industry.  Specifically, beginning in 1995, Intel began designing its CPUs to perform a process known as "speculative execution."  Speculative execution

increases performance by allowing a CPU to predict its next set of instructions.  Intel's priority on speed and performance, however, reduced Intel's focus on security.  As discovered by researchers from Google and elsewhere, speculative execution can be exploited by hackers to access sensitive data stored in the memory of a computer in order to steal passwords, encryption keys, photos, emails, instant messages, sensitive business documents, and other sensitive data.

19.     Meltdown affects every Intel processor manufactured since 1995 (other than Intel Itanium and Intel Atom before 2013).  The Spectre vulnerability is more far-reaching and impacts most desktops, laptops, cloud servers, and smartphones in use today.  Millions of devices in use today are affected by the Defect, including those manufactured by Apple, Asus, Acer, Google, Lenovo, Hewlett Packard, and Dell.

20.     After Intel finally acknowledged the Defect on January 3, 2018, companies like Google, Apple, Microsoft, and others have scrambled to release software patches to address the security vulnerabilities in Intel CPUs.  But since the Defect is a design defect existing in the hardware and architecture of each affected CPU, a software patch will do nothing more than "mitigate" the threat.  And, moreover, it has been widely reported that any mitigation patch could *reduce the performance of an Affected Device by up to 30% or more*.

21.     Only a full redesign of Intel's CPUs can remedy the Defect and eliminate the Meltdown and Spectre security vulnerabilities.  Indeed, Intel issued separate statements confirming that the Defect "is operating exactly as it is designed"[3] and that "Intel is continuing to investigate *architecture and/or microarchitecture changes* to combat these types of attacks."[4]

22.     On January 3, 2018, Intel issued a statement acknowledging that it had been made aware of the Meltdown and Spectre vulnerabilities, however, Intel downplayed the seriousness of the vulnerabilities, claiming that "Intel believes its products are the most secure in the world," and

---

[3]     Intel, https://www.intel.com/content/www/us/en/architecture-and-technology/facts-about-side-channel-analysis-and-intel-products.html (last visited Jan. 16, 2018).

[4]     *Intel Analysis*, at 8.

1    disputing reports that software and firmware patches to mitigate those threats would impact the

2    performance of a CPU.[5]

3           23.    Six days later, on January 9, 2018, Intel continued to downplay the claims of reduced

4    performance but conceded that "8th Generation Core platforms with solid state storage will see a

5    performance impact of 6 percent or less*" while acknowledging that its assertion of a 6% slowdown

6    was based on "individual test results [that] ranged from 2 percent to 14 percent."[6]

7           24.    That same day, Microsoft issued a statement addressing the Meltdown and Spectre

8    vulnerabilities and confirmed that software mitigation patches will result in slowdowns of devices

9    running Windows 10 on newer silicon (2016-era PCs with Skylake, Kabylake or newer CPU), while

10    "**significant slowdowns**" and "**decrease in system performance**" will occur on devices running

11    Windows 10 on older silicon (2015-era PCs with Haswell or older CPU) and Windows 8 and

12    Windows 7 on older silicon, as well as with Windows Server on any silicon.[7]

13           25.    Although researchers reportedly informed Intel of the Meltdown and Spectre

14    vulnerabilities in June and/or July 2017, Intel did not publicly acknowledge the Defect until January

15    3, 2018.  During that interim period, Intel's Chief Executive Officer, Brian Krzanich ("Krzanich"),

16    sold millions of dollars of Intel stock – the maximum allowable under Intel's bylaws – and received

17    more than $39 million before the security flaw became public.  While Krzanich cashed out and

18    avoided the anticipated drop in Intel's stock price as a result of the disclosure of the Defect,

19    consumers continued to purchase Intel's defective CPUs and Affected Devices equipped with Intel's

20    defective CPUs, which they would not have purchased had Intel disclosed the Defect.

21

22    ———————————————

[5]    Intel, *Intel Responds to Security Research Findings*, https://newsroom.intel.com/news/intel-

23    responds-to-security-research-findings/?cid=sem43700029310889950&intel_term=intel+meltdown-&gclid=Cj0KCQiAs9zSBRC5ARIsAFMtUXHxfP0Cap_XAl2L1aiEi3XHN07tAYPR7Eb1B5BnMs

24    MCtsvvEQgqSVcaAonnEALw_wcB&gclsrc=aw.ds&dclid=COX8-6Km0NgCFRmxTwodaxwM3A (Jan. 3, 2018).

25    [6]    Intel, https://newsroom.intel.com/news/intel-offers-security-issue-update/ (last visited Jan.

26    16, 2018).

27    [7]    Terry Myerson, *Understanding the performance impact of Spectre and Meltdown mitigations on Windows Systems*, https://cloudblogs.microsoft.com/microsoftsecure/2018/01/09/understanding-

28    the-performance-impact-of-spectre-and-meltdown-mitigations-on-windows-systems/ (Jan. 9, 2018).

26.     Intel knew or should have known of the Defect long ago but either failed to disclose the Defect or was negligent or reckless in failing to discover it.  Indeed, working without the benefit of Intel's proprietary information, at least three security researchers independently discovered the Defect in 2017.  With its inside knowledge and familiarity with the design and inner workings of its CPUs, Intel was in a better position to discover the Defect than third-party researchers and, as the manufacturer of the defective CPUs that it introduced into the market, Intel had a duty to do so.

27.     Thus, the CPUs Intel designed, manufactured, sold, and installed in Affected Devices sold to Plaintiffs and the Class were not merchantable and were not fit for the ordinary and particular purposes for which such goods are used.

28.     Plaintiffs and the other members of the Class are now forced to either purchase a new, Defect-free CPU or continue to use defective CPUs with serious security vulnerabilities and/or significantly reduced performance.

29.     Plaintiffs and the other members of the Class have suffered ascertainable injuries and a loss of money or property as a result of Defendant's wrongdoing because they would not have purchased Intel's CPUs, Affected Devices containing Intel CPUs, or would not have paid the price they paid, but for Intel's failure to disclose the existence of the Defect.

**CLASS ACTION ALLEGATIONS**

30.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following proposed Nationwide Class ("Nationwide Class"):

> ***All persons who, between 1995 and the present, purchased one or more Intel CPUs from Intel Corporation or its authorized retailer sellers, or one or more devices containing Intel CPU components, that are vulnerable to the Meltdown and/or Spectre***.

31.     In the alternative, Plaintiffs bring this action on behalf of the following proposed Florida Class ("Florida Class"):[8]

> ***All persons in Florida who, between 1995 and the present, purchased one or more Intel CPUs from Intel Corporation or its authorized retailer sellers, or one or more***

---

[8]     Unless otherwise noted, the term "Class" as used herein refers to the Nationwide Class and the Florida Class, collectively.

*devices containing Intel CPU components, that are vulnerable to the Meltdown and/or Spectre*.

32.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class may be expanded or narrowed by amendment or amended complaint.

33.     Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

34.     *Numerosity*.  The members of the Class are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs allege that the Class contains millions of members.  The precise number of Class members is unknown to Plaintiffs but is known by Defendant or its agents, however, and, thus, may be notified of the pendency of this action by first class mail, electronic mail, published notice, or other customary means that satisfy due process.

35.     *Existence and predominance of common questions of law and fact*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendant's CPUs are defectively designed;

(b)     whether Affected Devices containing Defendant's CPUs are vulnerable to security flaws, including Spectre and/or Meltdown;

(c)     whether Defendant had a duty to discover the Defect;

(d)     whether Defendant had a duty to notify the manufacturers of the Affected Devices of the Defect;

(e)     whether Defendant had a duty to notify purchasers of the Affected Devices of the Defect;

1         (f)     whether Defendant made any express warranties in connection with the sale of

2 its defective CPUs;

3         (g)     whether Defendant breached any express warranties in connection with the

4 sale of its defective CPUs;

5         (h)     whether Defendant made any implied warranties in connection with the sale of

6 its defective CPUs;

7         (i)     whether Defendant breached any implied warranties in connection with the

8 sale of its defective CPUs;

9         (j)     whether Defendant's acts and practices would deceive a reasonable consumer;

10         (k)     whether Defendant's acts and practices violated the Consumers Legal

11 Remedies Act, California Civil Code §§1750, *et seq.* ("CLRA");

12         (l)     whether Defendant's acts and practices violated the "unlawful" prong of the

13 Unfair Competition Law, California Business and Professions Code §§17200, *et seq.* ("UCL");

14         (m)     whether Defendant's acts and practices violated the "unfair" prong of the

15 UCL;

16         (n)     whether Defendant's acts and practices violated the "fraudulent" prong of the

17 UCL;

18         (o)     whether Defendant was unjustly enriched;

19         (p)     whether Plaintiffs and the other Class members have sustained monetary loss

20 and the proper measure of that loss; and

21         (q)     whether Plaintiffs and the other Class members are entitled to declaratory and

22 injunctive relief.

23     36.     ***Typicality***. Plaintiffs' claims are typical of the claims of the other Class members in

24 that the injuries suffered by Plaintiffs and the Class arise from a common nucleus of operative facts

25 based on Defendant's uniform conduct, and Plaintiffs are not subject to any unique defenses.

26     37.     ***Adequacy of representation***. Plaintiffs will fairly and adequately protect the interests

27 of the Class. Plaintiffs have retained counsel highly experienced in complex consumer class action

28

1  litigation, and Plaintiffs intend to vigorously prosecute this action.  Further, Plaintiffs have no

2  interests that are antagonistic to those of the other members of the Class.

3      38.  ***Superiority***.  A class action is superior to all other available means for the fair and

4  efficient adjudication of this controversy.  The damages or other financial detriment suffered by

5  individual Class members are relatively small compared to the burden and expense that would be

6  involved in individual litigation of their claims against Intel.  It would, thus, be virtually impossible

7  for the Class, on an individual basis, to obtain effective redress for the wrongs committed against

8  them.  Furthermore, even if Class members could afford such individualized litigation, the court

9  system could not.  Individualized litigation would create the danger of inconsistent or contradictory

10  judgments arising from the same set of facts.  Individualized litigation would also increase the delay

11  and expense to all parties and the court system from the issues raised by this action.  By contrast, the

12  class action device provides the benefits of adjudication of these issues in a single proceeding,

13  economies of scale, and comprehensive supervision by a single United States District Court and

14  presents no unusual management difficulties under the circumstances here.

15      39.  In the alternative, the Class may also be certified because:

16      (a)  the prosecution of separate actions by individual Class members would create

17  a risk of inconsistent or varying adjudication with respect to individual Class members that would

18  establish incompatible standards of conduct for Intel;

19      (b)  the prosecution of separate actions by individual Class members would create

20  a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the

21  interests of other Class members not parties to the adjudications, or substantially impair or impede

22  their ability to protect their interests; and

23      (c)  Intel has acted or refused to act on grounds generally applicable to the Class

24  as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the

25  members of the Class as a whole.

26      40.  Alternatively, certain issues relating to Intel's liability may be certified pursuant to

27  Fed. R. Civ. P. 23(c)(4).

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq*., et al.                - 10 -

1

2

3

**COUNT I**

**Violation of the Consumers Legal Remedies Act,**
**California Civil Code §1750, *et seq.***
**(On behalf of the Nationwide Class)**

4      41.     Plaintiffs reallege and incorporate by reference the allegations above as though fully

5    set forth herein.

6      42.     The CLRA "shall be liberally construed and applied to promote its underlying

7    purposes, which are to protect consumers against unfair and deceptive business practices and to

8    provide efficient and economical procedures to secure such protection."  California Civil Code

9    §1760.

10      43.     Defendant is a person as defined by California Civil Code §1761(c).

11      44.     Plaintiffs and the other members of the Nationwide Class are consumers as defined by

12    California Civil Code §1761(d).

13      45.     Defendant's CPUs are goods as defined by California Civil Code §1761(a).

14      46.     Plaintiffs' and each Nationwide Class member's purchase of Defendant's CPUs

15    constitutes a transaction under California Civil Code §1761(e).

16      47.     As alleged herein, Defendant violated the CLRA by misrepresenting the security and

17    performance of its CPUs and failing to disclose that a design defect existed in its CPUs that reduced

18    the security and performance of each CPU.  Thus, Defendant violated the CLRA by misrepresenting

19    and omitting material facts and engaging in the following practices proscribed by Civil Code

20    §1770(a) in transactions that were intended to result, and did result, in the sale or lease of goods to

21    consumers, including Plaintiffs and the other members of the Class:

22          (a)     representing that goods or services have sponsorship, approval, characteristics,

23    ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship,

24    approval, status, affiliation, or connection which he or she does not have;

25          (b)     representing that goods or services are of a particular standard, quality, or

26    grade, or that goods are of a particular style or model, if they are of another;

27          (c)     advertising goods or services with intent not to sell them as advertised; and

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.                    - 11 -

1          (d)      representing that the subject of a transaction has been supplied in accordance

2    with a previous representation when it has not.

3          48.      Defendant had exclusive knowledge of the Defect, which was not known to Plaintiffs

4    and the other members of the Nationwide Class, and Defendant actively concealed this material fact

5    from Plaintiffs and the other members of the Nationwide Class.  Thus, Defendant had a duty to

6    disclose the Defect to Plaintiffs and the other members of the Nationwide Class, but failed to do so.

7          49.      Defendant's deceptive acts and practices alleged herein are likely to deceive, and in

8    fact, did deceive, reasonable members of the public, including Plaintiffs and the other members of

9    the Nationwide Class.

10          50.      As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs

11    and the other members of the Nationwide Class suffered injury.  Plaintiffs and the other members of

12    the Nationwide Class are, thus, entitled to injunctive relief, court costs, attorneys' fees, and other

13    relief the Court deems proper.

14          51.      Pursuant to California Civil Code §1782(d), Plaintiffs seek an Order enjoining the

15    above-described wrongful acts and practices, and for restitution and disgorgement.

16          52.      Pursuant to California Civil Code §1782, on January 17, 2018, Plaintiffs' counsel

17    delivered a notice and demand letter to Intel, attached as **Exhibit A**, demanding, among other things,

18    that Intel repair and/or replace the defective CPUs purchased by Plaintiffs and the other members of

19    the Nationwide Class.

20          53.      If Defendant fails to rectify or agree to correct, repair, replace, or otherwise rectify its

21    violations of the CLRA within 30 days, Plaintiffs intend to amend this pleading to add claims for

22    actual, punitive, and statutory damages, as appropriate, as well as costs and attorneys' fees pursuant

23    to California Civil Code §§1780(e) and 1021.5.

24          54.      Pursuant to California Civil Code §1780(d), Plaintiffs have prepared and attached an

25    affidavit stating facts showing that this action has been commenced in a county described as a proper

26    place for the trial.  *See* **Exhibit B**.

27

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.                                    - 12

1

## COUNT II

2

**Unlawful Business Practices in Violation of the Unfair Competition Law,**
**California Business and Professions Code §17200, *et seq.***
**(On behalf of the Nationwide Class)**

3

4      55.      Plaintiffs reallege and incorporate by reference the allegations above as though fully

5   set forth herein.

6      56.      By reason of the conduct alleged herein, Defendant engaged in unlawful practices

7   within the meaning of the UCL. The conduct alleged herein is a "business practice" within the

8   meaning of the UCL.

9      57.      As alleged herein, Defendant engaged in unlawful business acts and practices in

10   violation of the "unlawful" prong of the UCL by:

11          (a)      violating the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

12   ("MMWA");

13          (b)      violating the CLRA; and

14          (c)      breaching implied warranties.

15      58.      Plaintiffs reserve the right to allege other violations of law by Defendant, which

16   constitute additional unlawful business acts or practices in violation of the UCL.

17      59.      Defendant's unlawful business acts and practices in violation of the UCL were likely

18   to deceive, and in fact, did deceive, members of the public, including Plaintiffs and the other

19   members of the Nationwide Class, who suffered injury in fact and lost money or property as the

20   result of Defendant's unlawful business practices.

21      60.      Plaintiffs seek an Order enjoining Defendant's unlawful business acts and practices in

22   violation of the UCL, and for restitution and disgorgement of all ill-gotten gains.

23

## COUNT III

24

**Unfair Business Practices in Violation of the Unfair Competition Law,**
**California Business and Professions Code §17200, *et seq.***
**(On behalf of the Nationwide Class)**

25

26      61.      Plaintiffs reallege and incorporate by reference the allegations above as though fully

27   set forth herein.

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.                - 13 -

62.     By reason of the conduct alleged herein, Defendant engaged in unfair business acts and practices within the meaning of the UCL.  The conduct alleged herein is a "business practice" within the meaning of the UCL.

63.     As alleged herein, Defendant engaged in fraudulent business acts and practices in violation of the "fraudulent" prong of the UCL by:

(a)     engaging in conduct, the utility of which, if any, is outweighed by the gravity of the consequences to Plaintiffs and the other members of the Nationwide Class considering reasonably available alternatives and legislatively policy;

(b)     engaging in conduct that violates established public policy; and

(c)     engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and the other members of the Nationwide Class.

64.     Defendant's unfair business acts and practices in violation of the UCL were likely to deceive, and in fact, did deceive, members of the public, including Plaintiffs and the other members of the Nationwide Class, who suffered injury in fact and lost money or property as the result of Defendant's unfair business practices.

65.     Plaintiffs seek an Order enjoining Defendant's unfair business acts and practices in violation of the UCL, and for restitution and disgorgement of all ill-gotten gains.

**COUNT IV**

**Fraudulent Business Practices in Violation of the Unfair Competition Law**
**California Business and Professions Code §17200, *et seq.***
**(On behalf of the Nationwide Class)**

66.     Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

67.     As alleged herein, Defendant engaged in "unfair" business acts and practices by:

(a)     designing, marketing, distributing, and selling defective CPUs without disclosing that the CPUs contained a design defect;

(b)     refusing to repair or recall the defective CPUs; and

(c)     refusing or failing to compensate injured consumers, including Plaintiffs and the other members of the Nationwide Class.

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.                    - 14 -

68.    Defendant's fraudulent business acts and practices in violation of the UCL were likely to deceive, and in fact, did deceive, members of the public, including Plaintiffs and the other members of the Nationwide Class, who suffered injury in fact and lost money or property as the result of Defendant's fraudulent business practices.

69.    Plaintiffs seek an Order enjoining Defendant's fraudulent business acts and practices in violation of the UCL, and for restitution and disgorgement of all ill-gotten gains.

### COUNT V

**Breach of Express Warranty**
**(On behalf of the Nationwide Class and the Florida Class)**

70.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

71.    Defendant designed, manufactured, advertised, and distributed defective CPUs. Defendant is a "merchant" and the Intel CPUs are "goods" within the meaning of the Uniform Commercial Code.

72.    In connection with each sale, Defendant represented that its CPUs provided a particular level of security, which they did not, and were of particular speeds, which, after implementation of a software patch necessary to mitigate security threats caused by a design defect, they are not.

73.    Defendant's affirmations of fact and promises relating to its defective CPUs became part of the basis of the bargain and created an express warranty that the CPUs would conform to Defendant's affirmations and promises.

74.    Defendant's express warranties run to Plaintiffs and the other members of the Class either directly or as third-party beneficiaries.

75.    Defendant breached its express warranties by delivering CPUs that failed to conform to Defendant's affirmations and promises.

76.    Defendant's breach of express warranties directly and proximately caused damages, injury in fact, and ascertainable loss to Plaintiffs and the other members of the Class, in an amount to be determined at trial.

77. All conditions precedent to this claim have been satisfied.

## COUNT VI

### Breach of Implied Warranty
### (On behalf of the Nationwide Class and the Florida Class)

78. Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

79. Defendant is a merchant with respect to the defective CPUs.

80. As such, a warranty that each CPU was merchantable and fitness for a particular purpose was implied in the contract of each sale to Plaintiffs and the other members of the Class.

81. To be merchantable, Defendant's CPUs, at a minimum, were required to: (a) pass without objection in the trade under the contract description; (b) be fit for the ordinary purposes for which such goods are used; and (c) conform to the promises or affirmations of fact made on the container.

82. Defendant's implied warranties extend directly to Plaintiffs and the other members of the Class either directly or as third-party beneficiaries.

83. Defendant breached the implied warranty of merchantability by delivering CPUs that were not merchantable in that: (a) the CPUs could not pass without objection in the trade under the contract description in that they provide deficient security and performance, which are key features of a CPU; (b) they did not conform to Defendant's promises or affirmations of fact regarding their security and performance; and (c) were not fit for the ordinary purposes for which CPUs are used, namely to provide fast and secure computer processing power.

84. Defendant's breaches of implied warranties directly and proximately caused damages, injury in fact, and ascertainable loss to Plaintiffs and the other members of the Class, in an amount to be determined at trial

85. All conditions precedent to this claim have been satisfied.

**COUNT VII**

**Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq*.**
**(On behalf of the Nationwide Class and the Florida Class)**

86.     Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

87.     Under MMWA, an "implied warranty" is one that "arise[s] under State law . . . in connection with the sale by a supplier of a consumer product." 15 U.S.C. §2301.

88.     Plaintiffs and the other Class members are "consumers," Defendant is a "supplier" and "warrantor," and the defective CPUs are "consumer products" as defined by the MMWA. 15 U.S.C. §2301.

89.     Defendant impliedly warranted that the CPUs it designed, manufactured, and sold were merchantable and fit for the ordinary and particular purposes for which the CPUs are used. Defendant breached the implied warranty with Plaintiffs and the other members of the Class by delivering CPUs that were neither merchantable nor fit for the ordinary and particular purposes for which the CPUs are used.

90.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the other Class members have been damaged.

**COUNT VIII**

**Unjust Enrichment**
**(On behalf of the Nationwide Class and the Florida Class)**

91.     Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

92.     This cause of action is pled in the alternative.

93.     Plaintiffs and the other members of the Class purchased from Defendant and its authorized retailers and resellers defective CPUs they would not otherwise have purchased but for Defendant's failure to disclose the Defect.

94.     As such, Defendant has been unjustly enriched at the expense of Plaintiffs and the other members of the Class.

95.    Under the circumstances, it would be unfair, improper, and unjust for Defendant to retain this financial benefit.

96.    Plaintiffs and the other members of the Class have no adequate remedy at law.

### COUNT IX

**Violation of Florida's Deceptive and Unfair Trade Practices Act,
Fla. Stat. §501.201, *et seq*.
(On behalf of the Florida Class)**

97.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

98.    The stated purpose of Florida's Deceptive and Unfair Trade Practices Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

99.    Plaintiffs and the other members of the Florida Class are "consumers," Defendant's CPUs are "goods," and Defendant is engaged in "trade or commerce" within the meaning of the statute. Fla. Stat. §501.203.

100.    Florida Statutes §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Florida Statutes §501.204(2) provides that in construing the foregoing subsection, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act."

101.    Defendant's design, manufacture, and sale of defective CPU units, without disclosing the existence of the Defect, is an unfair and deceptive practice that is likely to mislead – and has misled – consumers acting reasonably under the circumstances and, thus, Defendant's conduct offends public policies and is immoral, unethical, unscrupulous, and substantially injurious to consumers.

102.    Plaintiffs and the other Florida Class members have been substantially injured by Defendant's unfair and deceptive practices in that they relied on Defendant's specifications of

1    security and performance for each CPU unit they purchased but did not receive CPU units with such

2    specified security and performance features. Indeed, Plaintiffs and the other Florida Class members

3    would not have purchased Defendant's CPUs, or computer devices containing those CPUs, or would

4    not have paid as much as they did, but for Defendant's deceptive, misleading, and unfair practices.

5        103.    The damages suffered by Plaintiffs and the other Florida Class members were directly

6    and proximately caused by the deceptive, misleading, and unfair practices of Defendant, as more

7    fully alleged herein.

8        104.    Pursuant to Florida Statutes §501.211(1), Plaintiffs and the other Florida Class

9    members seek a declaratory judgment and Court Order enjoining the above-described wrongful acts

10    and practices of Defendant and for restitution and disgorgement.

11        105.    Additionally, pursuant to Florida Statutes §§501.211(2) and 501.2105, Plaintiffs and

12    the other Florida Class members assert claims for damages, attorneys' fees, and costs.

**PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

15    A.    Certifying the Nationwide Class or, in the alternative, the Florida Class as requested

16    herein, appointing Plaintiffs as Class Representatives, and appointing Robbins Geller Rudman &

17    Dowd LLP as Class counsel;

18    B.    Awarding Plaintiffs and the Class damages, including punitive damages and interest

19    thereon;

20    C.    Awarding declaratory, injunctive, and other equitable relief as permitted by law or

21    equity, including enjoining Defendant from continuing the unlawful practices described herein, and

22    directing Defendant to identify, with this Court's supervision, victims of its conduct and to pay them

23    restitution of all monies acquired through any act or practice declared by this Court to be wrongful or

24    unlawful;

25    D.    Awarding restitution and disgorgement of Defendant's revenues to Plaintiffs and the

26    Class;

27    E.    Awarding Plaintiffs attorneys' fees and costs; and

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.                    - 19 -

1    F.    Providing any and all further legal and equitable relief as this Court may deem just

2  and proper.

3                                **JURY DEMAND**

4          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, and Local Rules of this

5  Court, Plaintiffs respectfully demand trial by jury on all issues so triable.

6  DATED:  January 17, 2018                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
7                                              SHAWN A. WILLIAMS

8

9                                                _s/ Shawn A. Williams_
                                               SHAWN A. WILLIAMS
10
                                               Post Montgomery Center
11                                             One Montgomery Street, Suite 1800
                                               San Francisco, CA  94104
12                                             Telephone: 415/288-4545
                                               415/288-4534 (fax)
13
                                               ROBBINS GELLER RUDMAN
14                                               & DOWD LLP
                                               PAUL J. GELLER
15                                             STUART A. DAVIDSON
                                               CHRISTOPHER C. GOLD
16                                             120 East Palmetto Park Road, Suite 500
                                               Boca Raton, FL  33432
17                                             Telephone:  561/750-3000
                                               561/750-3364 (fax)
18
                                               ROBBINS GELLER RUDMAN
19                                               & DOWD LLP
                                               SAMUEL H. RUDMAN
20                                             MARK S. REICH
                                               58 South Service Road, Suite 200
21                                             Melville, NY  11747
                                               Telephone:  631/367-7100
22                                             631/367-1173 (fax)

23                                             WITES LAW FIRM
                                               MARC A. WITES
24                                             4400 North Federal Highway
                                               Lighthouse Point, FL  33064
25                                             Telephone:  954/933-4400
                                               mwites@witeslaw.com
26
                                               _Attorneys for Plaintiffs and the Proposed Class_
27

28

COMPLAINT FOR VIOLATIONS OF CAL. CIVIL CODE §1750, *et seq.*, et al.            - 20 -